

**ALFANO LEONARDO**

FILED

JAN 0 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

December 6, 2006

The Honorable Royce C. Lamberth
US District Court Judge
US Court for DC Circuit
333 Constitution Ave. NW
Washington, DC 20001

*Let this be filed in U.S. v. Ford,
Cr. 06-302
Cys to Counsel
Royce C. Lamberth
U.S.D.J. 1/2/07*

Re: Victim Statement - Docket No: CR-06-302

Dear Judge Lamberth:

    We are a small but well known public affairs and advertising firm based in Washington DC. We are regularly retained by trade associations, candidates for political and judicial office, and non-profit organizations to craft their communication, election, and advertising strategy.

    Our company has been in business for fifteen years—the first thirteen under the name "Alfano Communications". We have never had more than three employees at any given time. We are also relatively young corporate principals (Kim Alfano is 38 and Matt Leonardo is 33). Despite our size and youth, within our industry we are routinely recognized for our outstanding client work, having received dozens of awards and distinctions including being a four time "Addy" award winner. We were also recently honored with six "Telly" awards for our Public Affairs creative work—one of the most prominent methods for recognizing advertising and production agencies in the world.

    We hired the defendant as an office assistant in September, 2001. She came to us via her sister, Keisha, who had been working for us since 2000. The defendant's initial duties involved typical office work—answering phones, scheduling, opening mail, etc. As time went on, the defendant expressed an eagerness to take on more responsibility. As we are a small closely held business, we were happy to entrust the defendant with more important duties, including managing the company's accounts payable and receivable, making bank deposits, and interfacing with our vendors.

    The defendant's tenure with us was fairly uneventful. Despite a few apparent missteps, overall we considered her to be doing a fairly good job. We tried to build her confidence by praising her performance when we could, and gave her more responsibility

as a way of showing that we trusted her to do right by the company. In addition, beyond her salary, we bestowed significant monetary compensation and other generosities upon her to show that we valued her work. To this end, the defendant received annual bonuses that were always at least several thousands dollars. When she came to us for help in purchasing a house for her and her three small children the company happily advanced her the down payment. We also went way beyond the call of duty by allowing additional vacation and sick days, flexible work scheduling when her children were sick, and additional time off to attend school plays, or for anything relating to her children and family.

Simply put, we never refused to accommodate her, professionally or personally. We did this because we believe that as a small business, if you treat your employees well and give them the flexibility to be good to their families, then we can expect the same kind of loyalty and goodness in return. Given our size, we often struggle to compete and maintain our footing in a very competitive marketplace that is dominated by larger, more established agencies possessing tremendous resources. It is only our good work, solid reputation, and overall competency that allows us to compete for prospective clients, and more importantly, to retain our existing clients. Our employees are an integral part of this effort.

When we were forced to discharge the defendant in March 2005 after a dramatic drop off in performance and unexplained absences, we never suspected that our subsequent discovery of her unauthorized credit purchase at Blockbuster Video was anything more than a single indiscretion. As we hope the can Court understand, when we ultimately realized that the defendant had systematically engaged in a long running embezzlement scheme, we were shocked. The defendant's crime was simply devastating to us on a personal and professional level.

First, the defendant's crime cast a shadow over our company's reputation and has cost us as a result. During the course of the investigation, it was discovered that the defendant manipulated our company's books, financial systems and bank accounts as part of her embezzlement scheme. This revelation forced us to examine whether or not her scheme defrauded our clients. The defendant's actions thus placed us in an extraordinarily difficult and uncomfortable position: we felt obligated to notify every client of the theft because they too may have been victimized. It was an awful experience to do so. We of course had no control over how they would react to learning that they may have been bilked out of literally thousands of dollars. The pressure, stress, and humiliation weighed heavily on us each time we contacted our clients: were they going to fire us because they believed the company was somehow incompetent and allowed this to happen? What would they conclude about our internal operations? Even more disturbing for us as a young company trying to attract new business, this entire incident is now for public consumption. This means that prospective clients (and our competitors) just have to "Google" our company's name and they will find a US DOJ press release outlining the defendant's criminal activity at our company. We have no idea how to calculate the lost opportunity costs we have suffered and will continue to suffer as a result of what the defendant did.

Second, the direct financial impact of the defendant's crimes has obviously hurt our company. While the defendant has plead guilty to stealing $43,000, the actual amount she stole is more than double that amount. The diligent work of US Postal Inspector Marydith Newman and the US Attorney's Office, and our own internal audit, shows that over $100,000 was stolen from us between 2003 and 2005. That is a significant amount of money for a small agency like ours. We could have used that money in a host of positive ways. For example, we could have employed additional staff, or invested in the infrastructure of our company. We could have used those funds to recruit more clients, and reinforce existing client relationships. Finally, our company is committed to giving back to the community and the public (we led the first Hurricane Katrina Relief fundraiser in DC that raised over $30,000 for victims), and there is no question in our minds that we could have put the money to good public use. The defendant chose to put our money in her own pockets instead.

Third, the time it took to sort out the defendant's financial scheme cost the company dearly. Because her crime touched upon just about every aspect of our company's financials, including our accounting system, bank accounts, multiple credit cards, and client invoicing, it took us approximately 200 combined work hours to sort through it all and to determine exactly how much we lost. This effort included gathering dozens of documents and bank statements requested by the US Attorney's office; dealing with our bank, our credit card companies, and our vendors to reconstruct the theft and calculate literally tens of thousands of dollars in fraudulent charges; preparing for and attending multiple face to face meetings with investigators and prosecutors to review documents and explain the facts; and countless meetings and phone calls with our own attorney, who guided us through the investigation process.

Finally, the defendant's criminal misconduct caused a negative psychological impact on how we go about our business. We are a long standing member of the DC community that likewise relies on local businesses and vendors who, like us, have chosen to grow their businesses locally. We could have located our business in Northern VA like many other consulting firms, but we choose to stay in the City because we are proud to be part of the District. Hence, retaining and developing employees who reside or come from the District is essential to us. We take pride in working with young people who live here and who want to help our business grow. We spend significant time mentoring them and developing their skills, as it is important that our employees be motivated and consider themselves as trusted parts of the company.

It is unfortunate, but the defendant's crime was so insidious that we cannot afford to trust our own employees anymore. We no longer have a tight group that functions as a team because we do not assume (as we once did) that our employees are faithful. Instead, our employees are undeservedly scrutinized (can they immediately account for an expenditure? can they describe in exact detail everything they did at work so that our invoices are beyond reproach? can they document their interactions and exchanges with our vendors so that our internal accounting has no margin for error?). We are even reticent to delegate the most rudimentary financial related tasks (such as invoicing our

clients) out of fear of what another theft would do to us as a business. The defendant's crime has thus created a wholesale change in our corporate culture, a culture that our employees once told us was an important reason for their choosing to work with us over our competitors. That culture is gone. As a result, we face a real risk of losing members of our staff whom we have spent so much time and energy nurturing. We are equally concerned that we are no longer inclined to trust new employees to learn by doing. Put another way, we are afraid to take a chance on local residents, even though we need them as much as they need us to learn and develop valuable professional skills.

The defendant exploited the trust and opportunities we provided her. She methodically committed multiple acts of fraud against our company over a two year period, and illegally enriched herself by inflicting serious, irreversible damage to our company. Perhaps most troubling, since her actions came to light, the defendant has yet to make any effort to even apologize. It was only *after* prosecutors tracked the defendant down and confronted her with the checks she forged did she admit that she had indeed committed a serious crime. Her belated admission is of little solace to us. While she admitted what she cannot deny, she has yet to voluntarily express any remorse for her actions, or for the harm she caused to us personally and professionally. It is painfully clear to us that while the defendant may regret that she has been caught, she is in no way concerned about the moral implications of what she did. If given the chance to commit the same crime again, we therefore have no reason to feel that she would refrain from doing so.

In view of all of this, we respectfully request the Court to hold the defendant responsible. We ask that the Court exercise its sound judgment and impose an appropriate sentence.

Sincerely,

Kim Alfano-Doyle                    Matthew Leonardo